JOSIAH T. BUDD, ADMINISTRATOR OF JACKSON KEMP, DECEASED, APPELLANT, VS. WM. RYAL LONG, APPELLEE.

1. Where the land of one is levied upon to satisfy the debt of another, a bill for injunction may be maintained to restrain the sale, notwithstanding the party injured may have an action at law, an actual sale having the effect of bringing a cloud upon his title and affecting the value of the property to an extent not easily susceptible of measurement or redress at law.

2. A Court of Equity will not enjoin a judgment and execution on the ground that there were errors and irregularities in the proceedings anterior to judgment, the correction of such errors being the proper subject of motion or writ of error.

3. A levy by virtue of an ancillary attachment upon lands, creates a lien upon the land, of which subsequent purchasers are bound to take notice, and an irregularity anterior to the issuing of the attachment does not affect the lien.

4. A free colored person was not in the year 1863 prohibited by law from taking titles to or owning *real estate in this State*.

Appeal from the Circuit Court of Jefferson county in equity.

The case is stated in the opinion of the court.

*A. L. Woodward, Sr.*, for Appellant.

I. *Criminal Action.*—A judgment may be impeached in a court of equity for fraud, never for irregularity, the correction of error being the exclusive province of a court of law.    3 John. Ch., 375.

The appearance of appellee's vendor by attorney in the Circuit Court, without exception taken, was a tacit waiver of any irregularity in the proceeding in attachment, as well as in the action at common law.    1 Ala., (O. S.) 31 and 44.

Omissions and defects in affidavit and bond in a proceeding in attachment are not available on error, unless presented by plea in abatement in the court below.    6 Ala., 24; 9 Ala., 211, 214, 231.

*Fraud.*—It is respectfully submitted whether the sale and purchase of these lots *pendente lite*, did not infect it with the fraudulent intention alleged in the affidavit in attachment, and the concurrence of appellee be inferable from its proximity in time to that proceeding, in connection with inadequacy of consideration, Confederate currency being then three for one in specie value.    1 Story Eq., (Fraud) Sec. 258, '59, 349-369, 405 ; 2 White & Tudor's Leading Cases in Equity, 90, 91, 171-72.

In case of legal rights, the doctrine of *caveat emptor* applies, though equitable rights may be lost by sale to a *bona fide* purchaser without notice.    2 Munf.. 316 ; 1 Wash., 211.

In this case legal rights alone are involved, and appellee

had constructive notice, by *lis pendens*, affecting the entire subject matter of the contract, as well as the particular lot on which the levy of the writ of attachment created a specific lien.

It is farther submitted whether the refunding of the purchase price of the lots did not operate as a virtual rescision of the contract by mutual consent, and render all the lots conveyed by the deed subject to the judgment subsequently obtained in the original action against appellee's vendor, equally with the one levied on under the attachment proceeding. If the appellee might have claimed rescision of this contract in a court of equity for defect of title, ought not a voluntary rescision of the contract by the parties to be sustained ? In the first, it would be, even in case free from fraud, for benefit of vendee ; in the second case, it ought to be, for intended fraud on creditors which failed of consummation. Equity considers what ought to be as having been done. 1 Story's Equity ; 3 Mon. 542.

*Effect of Answer in Chancery.*—Where a general replication is put in, and the parties proceed to a hearing, all the allegations to the answer which are responsive to the bill, are to be taken as true, unless they are disproved by two witnesses, or one witness and corroborating circumstances. 2 White and Tudor, 124–125.

An answer is responsive to the bill when it is a distinct, explicit and unequivocal reply on personal knowledge to a material statement or allegation, even though presenting matter in avoidance, and affirmative in character. 4 Cow., 316–43 ; 9 Cranch, 153. Nor is the effect of such answer impaired, though made by respondent in a representative character, the effect being due to source of the knowledge, and not the conduct which conveys it.

II. *Proceedings in Attachment Levy.*—The universal maxim of evidence in relation to judicial proceedings becomes peculiarly applicable to the proceeding in attachment

in the court below.   " *Omnia præsumuntur rite esse acta.*"
1 Starkie Ev.; 4 S. & M.

The want of the clerk's signature to the affidavit does not
render it void, the oath of the party being the substance,
the official signature mere form.   Like a *fi. fa.* in a similar
case it is amendable, and the court will consider it amended
where the question arises collaterally.   See 5 N. Car., 24,
421; 3 Minn., 128; 3 Dev., 151, 284; 1 Serg't & Rawles,
97; Coleman's Case, 55; 5 Wend., 303.   Courts favor ju-
dicial and final process.   9 Mass., 217; 10 Mass., 221; 11
Mass., 89; 13 Pick., 190; 14 Pick., 212.

As a general rule, the validity of a sale of property is
protected, unless the proceedings under which it was made
are absolutely void—*vide* 5 How. (Miss.) Rep., 253; Caines'
Rep., 267; 8 Cow., 548; 4 Monroe, 464–74—*a fortiori*, as
to the affidavit in attachment.   See 10 Ala.   Where pro-
cess and proceedings are merely erroneous and voidable,
they can be avoided only by the party, and he cannot make
the objection collaterally.   16 Johns., 539 ; 1 Cow., 736 ; 2
Ala., 670 ; 5 How. (Miss.,) 253.

The proceedings by attachment, under our statutes and
judicial decisions, are held to be (as in other States) of the
nature of a proceeding *in rem*.   The levy or "service of
the writ of attachment binds the property, except as to pre-
existing liens."   Thomp. Dig., p. 368, sec. 5; ib., sec. 1 ; 3
Fla., 2, 3 ; see also 4 Fla.; 9 Fla.   The effect of the levy
in the proceeding in attachment must be the same, whether
attachment be the basis of the suit, or merely ancillary to
the original action at common law.   The lien created by
the levy enures to the benefit of the plaintiff, and is con-
firmed by the judgment in his favor, when the attachment
has not been dissolved.

The effect of a purchase *pendente lite* is not to render
the contract *void*, but merely that the purchaser becomes
thereby chargeable with notice, and is bound by the judg-
ment or decree against the person from whom he derives

title, without being made a party. 1 Story's Eq., 394; Madd. Chy., 1 and 1; 5 Ohio, 460.

By the levy of the writ of attachment or seizure, the property taken and held within the jurisdiction of the court, in the same manner as in an admiralty proceeding, or where a court of chancery seizes property to be administered or disposed of. 20 Vt., 632; 6 B. Mon., 651; 7 Eng., 564–65. It follows from this principle, that the title of a purchaser under an attachment relates to the levy of the writ and becomes subject to the lien created by it, while it cuts off all junior liens, encumbrances and purchasers. 13 Mass., 73; 20 Vt., 189; 17 Conn., 67.

The following authorities show fully the nature of the lien created by and the effect of a levy under an attachment. 1 Story's Eq., 393; 5 Mon., 73; 1 Litt., 307; 2 Dana, 408–9; 3 Atk., 356; 1 Johns. Chy., 356; 1 McLean, 95; 17 Pick., 271; 19 Pick., 344; 14 N. Hamp., —; 4 S. & M., 578; 1 Ala., 678; 8 Ala., 606–13–16–19; 7 Eng., 564–65; 15 Eng., 343–44.

The levy of the writ of attachment is invested with these attributes, because an attachment is a proceeding *in rem.* The process by which the property is openly seized, forming a part of the judicial records of the country, accessible to all, and of which all are bound to take notice, and over which the court has control—all the proceedings from the levy to the final sale of the property having the force and sanctity of judicial records—of the act and judgment of the court itself. They stand in every respect in the attitude and position, and are invested with the character of the judgments of superior courts, and cannot be impeached, nor can these irregularities be enquired into collaterally. 20 Vt., 632; 4 Walls & Serg't, 474; 60 Barr, 272; 1 Brevard, 468; 6 Eng., 519.

The seizure of real estate under attachment operates as notice to the world. 17 Conn., 278; 6 Iredell, 233; 7 How. (Miss.) 658.

No act of the debtor can in any way affect the title after the levy is made.  17 Conn., 278; 7 Gill & Johns., 421; 4 Dev. & Batt., 388; 8 Ala., 606; 4 How., 579.

No·change of possession occurs in attachment of real estate. 13 Mass., 130; 16 Mass., 405.  Any one purchasing the property after the levy of an attachment, is a purchaser *pendente lite*, and takes subject to the lien of the attachment.  5 Mon., 86; 6 Eng., 411; 7 Eng., 564–5; 15 Ark., 333–44.

The complainant coming into possession of this land, with notice of the proceeding in attachment, and the levy under it, takes subject to the lien created, and the right and title to be acquired thereby, which extend by relation from the judgment recovered by the creditor, either under this proceeding or the original action to which it is ancillary, back to the levy of the writ of attachment, and takes priority of any claim of his to the property, and this effect and result he is estopped in law to controvert or deny.  He purchased in contemplation of law, for the value of the property, less the subsisting debt or incumbrance, which he had a right to discharge.  In other words, he was a mortgagor in possession, subject to be sold out if the debt was not paid.  Such is the position which the complainant occupies in this case.

*R. B. Hilton* on same side.

The grounds set up in the bill as those on which the injunction was sought, were various alleged irregularities in the course of the proceedings in the suit of Kemp, first, and Budd, his administrator, afterwards, against Clem.  The principles and authorities upon which I rely in this case, are to some extent the same as those cited at the present term in the case of Budd vs. Gamble. . Such as the following: In general, a court of equity will not enjoin for want of regularity in the judgment.  10 Gill & Johns, 358; 6 Gill, 391; 11 Wis., 391; 17 Md., 195, 211.  In the first of these cases, the principles governing courts of equity, when asked to enjoin proceedings under judgments at law, are laid down in

the following language: "Courts of Chancery do not lightly interfere with judgments at law. It is only for the prevention of fraud, or to relieve from substantial injury or gross injustice, that its high and extraordinary power of relief by injunction is ever resorted to. It is never exerted merely for the correction of *informalities* or *irregularities* in legal proceedings. He who seeks to avail himself of such defects must prosecute his remedies at law; from a court of equity he can receive no countenance."

In the case above cited, from 17 Md., where the irregularity complained of was taking a judgment of condemnation simply on default, whereas the statute required a writ of inquiry before condemnation, the court say: "Such irregularity will not justify the interference of a court of equity;" nor will a court of chancery interfere even for defect of jurisdiction in the court rendering the judgment. 2 Story E. J., sec. 898. But even were the grounds for the interposition of a court of equity other than those laid down by Judge Story, and the adjudications cited, are the objections to the proceedings against Clem such that Ryal Long could avail himself of them? The settled rule is that the proceedings in an attachment suit cannot be assailed *collaterally*, because either *wrong* or *irregular*. It is enough in such case to show that the court had jurisdiction. Drake on A., 448; 15 Ohio, 435; 1 Ind.

As regards the clerk's authentication of the affidavit, or in other words, his signature to the jurat, we have the affidavit of Thomas Simmons, the clerk, that the oath was actually administered by him, though he failed properly to attest it. Will a court of chancery require more than this? The jurat is not the affidavit. But were there not this testimony of Simmons', which is made a part of the answer, and being responsive to the bill, is therefore valid evidence, even if *ex parte*, the court will presume that the affidavit was made as required by law. 12 Robinson, (La.,) 132; 7 Porter, 483; 3 Ala., 709. Even had the affidavit not been *signed*, that

would not be a fatal objection to the attachment proceedings. 4 S. & M., 579; 8 Iowa, 310; 6 Fla., 718.

The court will remember that in the case at bar, the issue of the attachment was not the commencement of the action; the attachment was a subsequent proceeding ancillary to the original suit. In such cases we have an express decision by the courts of New York, that the sufficiency of the affidavit is "no longer a jurisdictional question." 13 Barb., 412.

To the other varied and multifarious objections set up and alleged against the proceedings against Clem, I reply in the language of this, the Supreme Court of Florida: "The law having entrusted to the courts the administration of justice, it is always presumed that every tribunal by which a case has been tried, has done what is right, unless the contrary appears upon the record of its proceedings." 11 Fla., 137; 4 How., 161; 1 Brevard, 392.

Under the laws of Florida, (Thomp., 368,) the service of the writ of attachment binds the property attached, except against pre-existing liens. And in 9 Fla., 69, the Supreme Court of Florida say : The levy of an attachment creates a perfect lien upon the attached property from the date of the levy. Finally, under the Statute of Uses, (27 Henry, 8,) the title to these lots never was in Bradley, and he therefore could not convey to Long.

*S. Pasco* for Appellee.

When a judgment is taken by default, the plaintiff must see to the regularity of his proceedings. 1 Fla., 378.

The common law suit of Kemp vs. Clem abated by death of plaintiff. There is no record of its revival. This is admitted by Budd in his answer to the bill of complaint, but he attempts to supply this defect by the affidavit of his attorney. Budd also claims in said answer that this said attachment was an auxiliary proceeding in said common law suit. Then it must have abated with it. Even had the original suit stood, the attachment was void. There is no

proof from the record that the paper filed as an affidavit was ever sworn to. Budd attempted to supply this defect by an *ex parte* affidavit of a former clerk of the court, but failed to get permission to file said affidavit in this cause, and it forms no part of the record proper. He claims that this omission was a mistake. It was a fatal mistake. There is nothing to indicate that this pretended affidavit was connected with this suit, nor in the bond with the papers, that said suit was brought to said Jefferson Circuit Court; nor is there any internal evidence in the bond to indicate its connection with the original suit of Kemp vs. Clem. No cause of action was filed, nor in the attachment levy was the land levied upon described as said Clem's; nor did the judge sign the minutes of the court at the term when the judgment was rendered.

Budd claims that the defects mentioned in the bill were cured by an appearance, but the record shows no appearance; nor does he allege any, save that the letters J. M. S. were entered upon the docket of the court opposite to the name of said Clem. He interprets J. M. S. as J. M. Smith; but this is no appearance, and if it were, J. M. Smith died before said judgment was rendered, and the record shows, as above, that it was rendered when Clem was neither personally before the court nor represented by his attorney. But these defects were not such as could be cured by appearance, for in taking advantage of a statutory remedy like an attachment, a party must comply with it strictly, the court having only a limited jurisdiction in such cases. 6 Fla., 13. If he did not, must a third party, who has acquired rights by his laches, have them stripped from him? Parol evidence cannot be introduced to supply the missing links in the chain, (Stark. on Ev., 998, 1000, 1020,) and if Budd has failed to comply with the law so as to make his judgment and execution against Clem perfect, then the rights which this defendant has in the meantime acquired cannot be disturbed. If Budd's pretended lien has lapsed for one hour, no subsequent

action can restore it, for in the meantime the title of Clem to this defendant has been thereby cleared of all its defects, and Clem has no longer any rights of property that Budd can hold subject to his claim; and Budd, in leaving this defendant in undisputed possession of the property for more than three years after the rendition of his judgment, virtually acknowledged this. The garnishment proceedings in connection with this attachment are of such a character as to indicate that Kemp, in his life-time, knew all the details of this bargain and sale by Clem to this defendant, and the conclusion is irresistible that he willingly assented to the substitution of the purchase money for the land itself. While Bradley, as guardian as aforesaid, is arranging the terms of purchase, (October 22, 1863,) the attachment is levied, but " by mistake," as Budd now claims two-thirds of the land is omitted in the levy, and the whole levy is fatally defective, for the coroner fails to describe it as Clem's. Kemp is acting under the advice of a careful attorney, well skilled in legal practice; he sees that he is stripped of his advantage by the neglect of the officer, and he now tries to grasp the purchase money by the process of the court, and to hold it for the satisfaction of his claim, so he makes the usual affidavit that he does not believe that Clem has visible property, upon which a levy can be made, sufficient to satisfy his claim against Clem. He works upon the fears of Bradley, and by service of his writ (October 26, 1863,) manages to stop in the hands of Bradley $900 of said purchase money in the so-called Confederate currency, then in circulation, and which it seems Clem had sold his land for, and Kemp was willing to receive for his said debt. The arrangement seemed to be for the benefit of all parties; the purchaser's title was confirmed by the substitution of the purchase money for the land, and Kemp recovered the advantage he had lost by the neglect of the coroner. Thus, by an act in which Kemp by his subsequent action acquiesced, the lands were exempted,

20

and more money than Kemp claimed in his affidavit as due was held subject to his debt in the hands of Bradley, as stake-holder for both parties ; so that, even if all the subsequent proceedings had been regular, the most that Budd could claim would be this purchase money. The record shows, and Budd in his answer admits, that by consent of Kemp the so-called Confederate money was funded in some other securities of a similar character, and that Budd, November 14, 1864, took a judgment for the same, and it was turned over to him, subject to the further order of the court; which further order was intended, of course, to mean the final judgment in the cause, which final judgment was rendered at a later hour the same day. Budd, in his answer, avers that this bond was placed in his individual care, but the court must have given it to him in the same character in which he is named in said suit, and he must have intended at the time to apply it to the satisfaction of said judgment indebtedness. It is the purchase money of the land kept in its present shape by the acts of Budd and his intestate, and it would be inequitable to cause the same lands to be twice subjected to the payment of the same debt. Budd acquiesced in said payment for more than three years, but after allowing said so-called Confederate money or bonds to perish in his hands after the failure of the so-called Confederate government, an after-thought suggests an effort to make this defendant's lands liable, not only those that he claims were really levied upon, but also those that were meant to be levied upon. He also levied upon a horse, as Budd admits in his answer, as the property of Clem, but he omits to mention that this horse was sold at sheriff's sale for $102 28, and that the proceeds thereof were credited upon his judgment, a fact which the record discloses. There was no evidence taken in the court below. It was tried entirely upon the record, the court ruling that no bill, answer or testimony could be received in contradiction or in exemplification of its own records. The following defects were brought to its

notice, the existence of which was proved by its records: No proof that Kemp ever swore to the truth of his so-called affidavit in attachment.   Nothing in the pleadings to connect the pretended attachment proceedings with the suit in which Budd claims his judgment.   15 Wis., 61; 5 Cald., 561.   The suit was never revived after the death of Kemp.   No cause of action was ever filed.   No interlocutory judgment by default was ever taken.   The minutes of the term at which the judgment was rendered were never signed by the judge. There is a variance between the judgment and execution.

If these defects are not fatal, then it is urged that by the co-operative action of Kemp the purchase money was substituted in place of the land; that it was placed in the hands of Bradley as stake-holder, to abide the result of the suit; that Kemp by his action elected to take said purchase money rather than the risk of making the land subject to his claim, and that it would be contrary to equity and good conscience, after he has made his election and stood by it for more than four years, to allow him to rescind his action to the detriment of this defendant, when subsequent events make it appear that his election was an unfortunate one, particularly when it is considered that the appellee was at the time of the substitution of said purchase money for the land under guardianship and entitled to the special protection of a court of equity.   Acts of 1848, ch. 155.

The court below, after a patient hearing of the cause, made a perpetual injunction enjoining Budd and the sheriff of Jefferson county from all further proceedings under and by virtue of said judgment and execution against said lands belonging to this defendant and mentioned in his bill of complaint, which said judgment is now before this honorable court for examination.

In reply to the special errors assigned, it is urged:

1. There was no appearance, and if there had been, the errors committed by appellant and his intestate are of such a nature that an appearance could not cure them.

2. The appellant should have conducted his suit regularly and to a valid judgment, in order to be able to subject to his claim the property bought by appellee of Clem while it was pending. If he failed so to do, and if in the meantime by his laches appellee acquired rights which have vested, these rights cannot now be disturbed under any plea of mistake or neglect.

3. There was no refunding of the purchase money, so far as we can judge from the record. The appellant says, in his answer, that Bradley procured the money by some means to him unknown. It is evident that the purchase money was stopped in Bradley's hands while the bargain and sale was being completed, and that plaintiff and defendant to the common law suit assented to the arrangement, and made Bradley their stake-holder. Neither do appellee's acts prove rescision of the contract. He went on and perfected his title by recording his deed. But the acts of both parties indicate a substitution by agreement between appellant's testator and appellee of the purchase money in place of the land, and this being a favorable bargain for appellee, he being under guardianship at the time it was made, a court of equity will give him the full benefit of his advantage.

4. The entry upon the garnishment to Bradley shows that Clem was willing to pay his indebtedness out of the price of his lands, and indicates a desire to settle the suit rather than to commit fraud.

5. The decree ought not to be reversed in regard to any part of the lands, for the attachment proceedings are void.

6. The appellant has shown no merits in his claim, neither he nor his intestate ever filed a cause of action, and the suit has not been prosecuted to final judgment.

*Jurisdiction.*—The aid of equity is here invoked against a fraudulent attachment. Appellee could not assert his rights in the court at law, because he was not a party to the cause. Necessity of notice in ancillary attachment; and in many of the cases cited by appellants the party failed, be-

cause he could not seek relief in equity. 1 Littel, 302; 6 Foster, 506; 1 Stock., 36; 5 Cold., 561; 11 Hump., 542; 4 Sneed, 453; 3 Cold., 140; 2 Head, 598; Tenn. Code, 3455, 3462; 3 Peters' Cond. Rep., 312.

The question in the amended assignment of errors is now for the first time raised, and only shows a defect in the bill, if it shows anything at all.

The question of jurisdiction being raised in this cause for the first time in the appellate court, the appellee respectfully submits the following authorities upon this point, in addition to those hastily cited at the hearing :

"A grantee may enjoin the sale of the premises on execution against the grantor, because such sale, though invalid, would cloud his title." 25 Cal., 337.

"So equity may interfere by injunction in favor of one who owns and has possession of the lands, but upon whose title a cloud rests in consequence of an adverse claim." Quoted in Hill. 348, p. 1 ; 34 Vt., 484.

" And a statutory remedy, by motion to supersede an execution, does not deprive the chancery court of its original jurisdiction to remove a cloud upon the title to land." Hill. on Injunc., 227, and cases cited thereunder, among them 17 Ga., 249.

" The withdrawal of a claim to real estate does not affect the right of the claimant subsequently to file a bill praying for a perpetual injunction against the levy of executions on such estate." Quoted in Hill., 228, p. 109.

" It is held, in general, that the jurisdiction of equity to enjoin a sale of real estate, is co-extensive with its jurisdiction to set aside and order to be cancelled a deed of the property." 15 Cal., 127.

" So that if a valid judgment at law be iniquitously used, equity will annul what has been improperly done under it." 2 Dev. N. C. Chy., 160.

" So chancery will grant an injunction to prevent a party's

making use of a legal writ of execution for the purpose of vexation and injustice." 2 Root Conn., 109.

" Or restrain the sale of property illegally taken in execution." All quoted in Hill., 232, p. 123.

" An execution sale may be enjoined where it would cause a cloud on the title of the complainant." 2 R. I., 67; 19 Iowa, 305; 15 Cal., 127.

" And this, although a sale of only the debtor's right, title and will." " So, although in fact no title will pass thereby, the property not belonging to the execution defendant." The two last quoted in Hill. on Injunc., 234, p. 126.

In the case cited, (27 Miss., 428,) where an apparently different view is taken, it is where " the sheriff's sale would not pass any title to the purchaser." But where the judgment is apparently regular, and the attachment proceedings are not impeached, it has been frequently held that the sale under execution is valid. And if such sale is valid, the threatened wrong is irreparable. 1 Ind., 296; 6 Vt., 586; 3 Denio N. Y., 167; 3 Wis., 773; 15 Ohio, 435.

It is further held, with reference to conflicting claims upon the property in question, that "where the title of a claimant is clear and unquestionable, chancery will enjoin a sale under an execution against a stranger." Hill. on Injunc., 235, p. 128; 7 Hump. Tenn., 452; Char. R. M., (Ga.) 355.

" Or where the plaintiff has possessed himself of something, by means of which he has obtained an unconscientious advantage." Dan. Chy. Pr., 1728.

" In general, it may be stated that in all cases where, by accident, or mistake, or fraud, or otherwise, a party has an unfair advantage in proceeding in court of law, which must necessarily make that court an instrument of injustice, and it is therefore against conscience that he should use that advantage, a court of equity will interfere and restrain him from using the advantage which he has thus improperly gained." Story's Eq. Juris. 2, 217, p. 885. Similar language

is used in Dan. Chy. Pr., 1725, where Jordan vs. Williams and many other cases are cited.

No person can enjoin a judgment at law to which he is not a party, but if he is aggrieved, he should pray an injunction to the execution. 3 Ran., 501.

In regard to the amended assignment of errors, appellant admits in his answer to the bill of complaint that appellee purchased the land from Clem, as stated in his said bill. In the bill the complainant and appellee alleges that he purchased for a valuable consideration, and if he is mistaken in alleging that he could not have purchased in his own name, he clearly alleges that his money was there invested.

The statutes then in force nowhere prohibit a free person of color from holding property, and such a right is certainly recognized when a penalty is imposed upon those who buy of or sell to without the guardian's consent; but even then the sale or purchase is not declared void. It seems to have required a statute to prevent even slaves from holding property in their own right. Thomp. Dig., 541, p. 107. The rights of free persons of color, as parties to legal action, have been fully recognized by statute and a decision of this court. 3d Session Acts, ch. 155; 5 Fla., 260.

The appellee appears to have fully complied with all the laws. He selected his guardian, and his guardian consented to this purchase. The error assigned is indefinite and uncertain, but if the appellant claims that the title never vested, upon the ground that it was a use limited upon a use, it seems to be fully met in Bacon's Abridgement, Atricle Uses and Trusts, H., 1, " where uses are limited upon uses," and cases there cited. The consideration moving from Long, equity holds Bradley in conscience as a trustee, and the original conveyance is valid. So far as Clem is concerned, he has parted with his estate. The legal estate vesting in Bradley, and the equitable right in Long, a voluntary conveyance from B. could bring the two together in L. as effectually as a bill in chancery. Bacon's Ab., Uses and Trusts.

All the circumstances necessary to make a good deed of covenant to stand seized to uses, seems to have been complied with in the transaction between Clem and Bradley. There was a sufficient consideration. There was a deed duly executed and recorded. Clem, the grantor, was actually seized of the land conveyed at the time of the grant. There are words sufficient to convey lands.

If the objection is, that the use was executed by the statute, and that under the statute of uses the legal estate passed at once with the possession to Long, and that the estate could not vest because Long was incapable to hold property, the argument fails, because it is based upon a false assumption—Long being in law capable to take the estate, as already shown.

RANDALL, C. J., delivered the opinion of the court.

W. Ryal Long filed his bill in chancery against J. T. Budd, former sheriff, &c., and *ex officio* administrator of the estate of Jackson Kemp, deceased, and Daniel L. Oakley, sheriff of Jefferson county, alleging that on the 25th October, 1863, he purchased for a valuable consideration, through one C. A. Bradley, from one Valentine Clem, a piece of land near Monticello, described as follows : The south half of an acre of land known as the southwest corner of the southwest quarter of section 19, T. 2, R. 5, N. and East, and also the adjoining block on lot on the south side, containing two hundred feet square, on the east side of the northeast corner of the Monticello eighth of land, containing one and a half acres, more or less. That complainant being then a free person of color, the property was purchased in the name of Bradley for the use of complainant, because under the laws of this State the purchase could not be made in his own name; that the deed of conveyance therefor was duly recorded December 14, 1863, and subsequently Bradley released the said property to the complainant. The deed of Valentine Clem to Bradley conveys the property to Bradley,

his heirs, executors, administrators and assigns, for the use of said Long, his heirs, executors, administrators and assigns; and the deed of Bradley to Long, dated July 31, 1868, recites that whereas, the laws of Florida formerly rendered it unlawful for a free person of color to buy property without the intervention of a guardian, and that Long, while such laws were in force, accumulated property and purchased the lands in question, taking the titles thereto in the name of Bradley, who acted as his guardian, and such laws being no longer in force, and said Bradley having no individual interest in the property, he thereupon released and conveyed the same to Long, together with other property similarly acquired. Copies of these deeds are annexed to the bill as exhibits; that complainant remained in possession of the lands until the 13th November, 1868, when Oakley, sheriff of Jefferson county, levied upon them under an execution issued in favor of Budd, as administrator of Kemp against Clem, upon a judgment rendered November 14, 1864, for $932 and costs; that said judgment was void because of sundry irregularities in the record; that after the death of Kemp the suit was not revived; that the administrator claims to have a lien upon the land by virtue of a writ of attachment issued October 22, 1863, in favor of Kemp against Clem, which was returned executed " by levying upon the following property, to-wit: one half acre, being the south half of an acre in S. W. corner of E. $\frac{1}{2}$, S. W. $\frac{1}{4}$, sec. 19, T. 2, R. 5, N. and E.;" that the attachment is void because there was no affidavit upon which it was issued, the jurat not being signed, and other irregularities and defects; that the judgment ought to be discharged because of certain garnishment proceedings, in which the money of complainant in the hands of Bradley, which was placed in his hands by complainant to purchase the land, was seized, which money was afterwards funded by Bradley, with the consent of Kemp, in Confederate securities, which were ordered by the court to be held by Budd to await the further order of the court, and in the meantime

these securities became worthless; that the levy under the execution covers one and a half acres, being one more than was levied on by the attachment, and the execution is alleged to be void because it recites a judgment rendered November 15, 1864. Whereas, the judgment, if rendered at all, was rendered on the 14th November, 1864.

And the bill prays that said judgment may be set aside, or that the levy be discharged on account of the illegality of the attachment, or that the judgment may be satisfied to the extent of the amount of the said purchase money paid over to Budd under the order of the court; that complainant's lands may be declared not subject to the judgment and execution, and that the appellant be enjoined from further proceedings under said judgment and execution against his said lands, and for general relief.

The answer of defendant, Budd, after insisting that there is no equity in the bill, admits the purchase of the land from Clem, and the payment therefor by complainant as alleged, but says that the purchase was not made until after the attachment issued in behalf of Kemp had been levied; that the affidavit for the attachment was actually sworn to; that soon after the said purchase, complainant, who had paid Clem the purchase price of the land, was informed of the levy, and that Bradley by some means recovered for complainant a large sum of the same money he had paid Clem for the lands; that the money was funded in four per cent. certificates of the Confederate States by Bradley, by the consent of all the parties in the proceedings; that the court ordered said certificates to be held by said Budd, as sheriff, until the further order of the court, and meantime the same became worthless, and the court has never made further order in the premises; that the suit of Kemp vs. Clem was revived after the death of Kemp in the name of defendant, Budd, *ex officio* administrator; that Clem entered his appearance in the suit in the spring term of 1863 by John M. Smith, his attorney, and also in the fall term, 1864, at which the judg-

ment was rendered against Clem in favor of defendant as administrator of Kemp ; that the attachment was a proceeding in the action ancillary to the original suit, and Clem had personal notice thereof ; that the judgment was rendered on the 15th November, 1864 ; that by virtue of the levy of the attachment upon the property, the judgment was and is a lien upon it ; that the judgment has not been paid or satisfied, nor any portion thereof, except costs ; that if all the lands purchased by complainant of Clem were not levied on by virtue of the attachment, it was intended that they should be ; that Oakley, as sheriff, levied the executions, as alleged, upon the property mentioned in the bill, and he claims that all said property was subject to the lien of said judgment, and the complainant's title, if he had any, was subject to said lien.

The complainant filed a general replication.

On January 28, 1869, a final decree was rendered by the court. The decree recites that the "cause came on for a final hearing upon the bill, answer and other papers filed in said cause."

(It may be remarked here, that a certified copy of the record and proceedings in the suit of Kemp against Clem was brought up by *certiorari*, and was used by the appellee upon the argument ; but upon examining that record and the proceedings in this case, we cannot find that that record was used or offered upon the hearing in the Circuit Court, and it is therefore not properly a part of the record in this case. Nor do we see that anything contained in it can affect the decision of this cause.)

The decree was in favor of the complainant, declaring that the judgment was not a lien upon the property, and enjoining all further proceedings under the execution against the property mentioned in the bill, and awarding costs against the defendant, Budd. From this decree the defendant, Budd, appealed.

The appellant insists that the decree should be reversed, because :

1. The appearance of the attorney of the appellee's vendor in the original action, without exception to the proceedings in ancillary attachment, was a waiver of any irregularities or omissions therein.

2. That appellee was a purchaser *pendente lite*, the land being subject to the lien created by the levy of the writ of attachment, which in this proceeding was notice to the world.

3. That the refunding and acceptance of the purchase money of the land was virtually a rescision of the contract in relation to it, rendering all the land conveyed by the vendor's deed subject to the judgment obtained against him.

4. That the acts and conduct of the vendor and vendee afford at least presumptive evidence of the truth of the alleged fraudulent intention of the vendor, with the cognizance of the vendee, which alone renders the decree erroneous and a proper subject of reversal.

5. That the decree ought to be reversed, so far at least as it enjoins the judgment against that portion of the land levied on under the proceeding in attachment, and binding upon it " except as to pre-existing liens."

6. That the title to the land conveyed by Clem to Bradley for the use of Long, never vested in Long, neither in law nor equity—neither under the statute of uses nor bill in chancery, to execute the trust, if any were created by the deed.

I. The appellants, in their brief and argument, insist that there is no equity in the bill; that every right the complainant sets up might be available at law, and that where the law affords an ample and complete remedy, equity will not interfere. This position is generally correct, and it is true that the complainant has stated much in his bill which cannot be available to him either at law or in equity.

It is said, however, that it would be difficult to enumerate all the cases in which the remedy by injunction may be ap-

plied. The extent to which the jurisdiction may be carried is not marked out by any adjudged case, and, in the nature of things, it must forever remain undefined. Willard's Eq., 408. Equity will not interfere to prevent a mere trespass, and the sheriff, in seizing the complainant's property, may be a mere trespasser, and the actual damage may be recovered at law ; yet an actual wrongful sale and conveyance of real property, though it may not operate to dispossess the owner, yet brings a cloud upon his title and tends to annoy him, and really affects the value of the property to a greater or less extent, not actually susceptible of measurement or redress in an action at law. It has been held, and, as we think, very properly, that where the real property of one is levied on to satisfy the debt of another, a bill of injunction may be maintained to restrain the sale, notwithstanding he has also remedies at law, and although the sheriff, by reason of his doubts as to the title to the property, takes an indemnifying bond. Wilson vs. Butler, 3 Munf., 559 ; England vs. Lewis, 25 Cal., 337.

II. But equity will not enjoin a judgment or execution merely on the ground of errors or irregularities in the proceedings on which the judgment was rendered. Dana vs. Fish, 8 Blackford, 407 ; Redwine vs. Brown, 10 Ga., 311 ; Reynolds vs. Horrine, 13 B. Mon., 234 ; 6 Gill, 391. Authorities to this point are numerous, that a collateral inquiry into the regularity of proceedings before a court of record will not be allowed, except to show an entire absence of jurisdiction, and that a court of chancery cannot be used to correct errors in proceedings at law, and particularly at the instance of third parties. See Shottenkirk vs. Wheeler, 3 J. Chy. R., 280 ; DeReimer vs. DeCantillon, 4 id., 92 ; French vs. Shotwell, 6 id., 235.

That there are several irregularities and omissions alleged by the complainant to exist in the record in the suit of Kemp against Clem, may be true, and also, it may be that the sup-

posed affidavit of Kemp, upon which the ancillary attachtachment was based, was not sworn to.

These are irregularities which might have been taken advantage of by the defendant in that suit, either by motion or writ of error, but they do not affect the jurisdiction of the court over the person of the defendant, or the subject matter of the suit.

The writ of attachment was doubtless regular on its face, and until it was dismissed or the levy under it vacated, third persons are bound to take notice of the levy.

The summons was duly served on the defendant, Clem, at the suit of Kemp. The suit was subsequently proceeded in and judgment taken by Budd as administrator of Kemp, deceased. The defendant permitted this proceeding without objection, (and certainly no other person could object.) The court was competent to protect itself, and is presumed to have acted upon what was before it, and to have acted correctly, until its proceedings are reversed or set aside.

III. The levy of the attachment was made upon one half acre of the land described in the complainant's bill. The complainant had purchased, and Clem had conveyed to him through Bradley one acre in addition, which the sheriff failed to levy upon under the attachment, but which is now levied upon by virtue of an execution as the property of the defendent, Clem, and it is even claimed that it is bound by the attachment because it " should have been attached," and the omission to attach it was an oversight or mistake. There is no charge of fraud in the purchase of the property by the complainant, nor can the doctrine of *lis pendens* be well carried to the extent that a levy of one of the parcels of land by attachment affects any property other than that seized. The lien attached only by the levy, and is limited by the levy. That there may have been a fraud intended to be perpetrated upon creditors by this sale, is granted, but there is no fraud alleged or proved, and it is asking too much to insist that fraud may be implied in a case like this. On the

contrary, we are impressed that the complainant acted in perfect good faith.

IV. It is insisted by the appellant that because the complainant was a "free person of color," he was, under the laws of this State in 1863, incapable of taking title to the property. Indeed, the complainant considered himself incapable, as he says, of taking the title in himself, and therefore bought and paid for the property, taking title in the name of Bradley, but for his use.

Under the statute of uses, the property conveyed vested immediately on the conveyance being executed in the *cestui que use*, unless the latter was prohibited by some law from taking property. We are not referred to any law of this State which prohibited free persons of color from taking and holding property in their own names, nor are we aware of the existence of any such law. It is true, there was a law requiring free negroes and mulattoes over twelve years of age to select guardians, and the guardian so selected must have been approved by the Judge of Probate, and was empowered to sue for any money due to the negro, and had the same control over such persons as was possessed by guardians in other cases. Act of January 8th, 1848. In 1856, it was enacted that every free negro over twelve years old, who should fail to have a guardian, should be fined and committed to jail until the fine should be paid; and further, that it should not be lawful for any person "to buy of or sell to any free negro or mulatto in this State without the written consent of the guardian," and any person violating this provision was subject to a fine not less than one hundred or more than five hundred dollars.

These acts recognized the right of free persons of color to purchase and own property, to earn money, and to recover it through the courts. It is implied that they could not sue in their own names, but elsewhere it is held by the courts that they may be sued in their proper names without a guardian. Davis vs. Fitchett, 5 Fla., 260. Nor does the common law

prohibit this class of persons holding and conveying property. They occupied an inferior rank in the community, and were not generally regarded as citizens, nor as foreigners or aliens, but were inhabitants or subjects. Chancellor Kent says in a note to vol. 2, p. 258, 3 ed., of his Commentaries: " The privilege of voting and the legal capacity for office are not essential to the character of a citizen, for women are citizens without either ; and free people of color may enjoy the one, and may acquire, and hold, and devise, and transmit by hereditary descent, real and personal estate," all subject, of course, to such municipal regulations as may be prescribed by the State.

In the conveyance to the complainant, Long, by Bradley, the latter declares that he held the property purchased with the money of Long *as his guardian.* There is no issue in this case as to whether he was properly appointed a guardian under the law of the State, and for aught that appears, Long may have been under twenty-one years of age at the time of the purchase. Certain it is that Long's money paid for the land. It is difficult to find any principle of equity or good conscience which can justify the subjection of property thus conveyed to a free colored person for a valuable consideration, paid by himself in good faith, to the payment of the debts of his grantor, merely because he was such a person.

Is it true that the money earned by a free colored person could purchase nothing ? that such money was not a good consideration for a conveyance to him or to his use, or that the conveyance was void ? I cannot consent to this, nor do I find a hint toward it in the reported decisions of our courts. The only importance, in my opinion, to be attached to the statutes in question, is that they treat this class of persons as under similar disabilities with infants, and these laws are rather designed for their protection, than to be used as traps and snares for despoiling them.

V. It is insisted that the refunding and acceptance of the purchase money of the land was virtually a rescision of the

contract, rendering all the land conveyed by the vendor's deed subject to the judgment obtained. But there is nothing in this record showing a refunding to and acceptance of the purchase money to the grantee. The answer alludes to some transaction by which the grantee evidently undertook to save himself from loss, but what was done does not distinctly appear, except that Long saved a part of his money. Certainly it does not appear that the contract was rescinded, but the complainant alleges, and the defendant does not deny, that the grantee paid a valuable consideration for the property ; that it was conveyed, and he now holds the property under that conveyance. It may be that the grantee lost nothing by the garnishment proceedings, but it seems that a loss was sustained by *somebody* in that transaction, for something of considerable value was seized under the garnishment, and held at the instance of the plaintiff until it became worthless. And but for this latter fact, the plaintiff would doubtless have realized the greater portion of his judgment out of it. The garnishment proceedings, however, have no influence upon the case as stated, or the rights of these parties, whether they were regular or irregular.

This case was presented and argued as upon the bill and answer, there having been no testimony taken, and there is nothing else in the record which we can consider, the exhibits being treated as part of the pleadings. The half of one acre of land, which was seized by virtue of the attachment referred to in the pleadings, was from the time of that levy liable to be levied upon and sold to satisfy the judgment recovered in the suit of Kemp vs. Clem. The other land, described in the bill as having been levied upon by the execution under that judgment, was not subject to such levy, and the complainant is entitled to an injunction restraining its sale.

The decree of the Circuit Court, as to the one half acre of land levied upon by the writ of attachment, is reversed ; and as to the residue, the decree is affirmed. Each party to pay one-half the costs incurred upon this appeal. .